**Ar-Tik Systems, Incorporated, Plaintiff-Appellee, v. Lark Sales Company, and L. S. Murchie, Defendants-Appellants.**

**Gen. Nos. 10,957, 10,987, 10,988, Consolidated.**

Second District.

January 9, 1957.

Released for publication January 26, 1957.

Graham, Califf & Harper, of Moline, for appellants; Robert G. Graham and Robert J. Shaw, of counsel.

Bozeman & Neighbour, of Moline, Evans, Mershon, Sawyer, Johnston & Simmons, of Miami, Florida, for plaintiff-appellee; Virgil Bozeman, and O. B. Simmons, of counsel.

JUSTICE EOVALDI delivered the opinion of the court.

These three cases were consolidated for argument and opinion.

No. 10,957 is an appeal from an interlocutory order entered April 9, 1956 granting a temporary injunction upon the complaint of plaintiff-appellee. The injunction was granted after notice, appearance and a full hearing consuming several days.

Thereafter the defendant-appellant filed a counterclaim and made an application for temporary injunction, which was presented to the court and a full hearing had and an order entered denying the injunction requested by the defendant and the defendant has prosecuted an appeal to this court from that order in case No. 10,987.

Thereafter the trial court on June 29, 1956 modified the order entered on April 9, 1956 and the defendant-appellant appeals from that order. This was the order entered in No. 10,988.

In No. 10,957 a temporary injunction was granted on April 9, 1956 upon the complaint of plaintiff restraining Lark Sales Company, an Illinois Corporation, and L. S. Murchie, defendants-appellants herein, from collecting any monies from any persons for and on behalf of plaintiff and from using, withdrawing or otherwise disposing of any funds which defendants then had which belonged to plaintiff. The court granted the temporary injunction on motion of plaintiff, after hearing argument based on the pleadings, affidavits attached thereto, and certain restricted evidence offered on behalf of the parties.

All of the pleadings are verified. They consist of plaintiff's complaint, plaintiff's motion for a temporary injunction, defendants' answer, answer of defendants to motion for issuance of a temporary injunction, and reply of plaintiff to said answers.

The prayer for the temporary injunction granted in this cause was by way of ancillary relief to plaintiff's complaint which was in three counts. The first count consisted of a demand by plaintiff for an accounting from defendant, Lark Sales Company, alleged to be acting in a fiduciary capacity, in its duty to collect and remit monies for Ar-Tik Systems. The second count is a prayer for damages for breach of the contract. The third count is a prayer for permanent injunction. Defendants-appellants' theory on this appeal is that the injunction violates the rule prohibiting temporary injunctions which do not maintain the status quo; that the effect of the injunction is to specifically enforce the contract and thus grant plaintiff substantially all of the relief obtainable by final decree; that the granting of specific performance or any other equitable relief to plaintiff in connection with the contract is improper where plaintiff has not complied with the provisions of the contract requiring performance on its part; that the granting of the injunction will re-

sult in greater and more substantial injury and inconvenience to defendants and other parties to the contract than would have resulted to plaintiff from the refusal of the injunction; that all of the parties to the contract should have been made parties to the action before the granting of any injunction; and that there were no sufficient allegations in the complaint or sufficient showing in the evidence of irreparable injury to plaintiff.

Plaintiff's theory of the case is that it made out a prima facie case for its right to an accounting, which right had in fact been admitted by defendants; that the evidence shows without question that defendants were acting as fiduciaries under a contract requiring them to collect and remit to the plaintiff all monies collected for plaintiff by the tenth of the month following collection; that defendants breached the contract in that, (a) they collected in excess of $60,000 which they failed and refused to remit to the plaintiff, despite repeated demands; (b) they converted the monies so collected to their own use; and, (c) they failed to comply with other plain provisions of the contract; that plaintiff had fully performed under the contract; that it had, pursuant to the terms of the contract, and prior to instituting suit, terminated defendants' right to act for it; that there was no showing of any hardship on defendants; that the injunction required nothing more of the defendants than that which they had agreed to do by the terms of the contract; that the alleged hardships, if any, grew out of contractual terms and defendants' breach thereof and not by virtue of the court's injunction; and that the court had before it all necessary parties, all others having been shown by the record to have assigned their rights to defendant, Lark Sales Company; that under these circumstances, the trial court, in its sound discretion, properly granted a temporary injunction restraining

the defendants from collecting plaintiff's funds which were in the hands of defendants, pending a disposition of the lawsuit between the parties.

In No. 10,987 an order was entered on June 29, 1956 by the circuit court denying the motion of defendant, counter-plaintiff, for a temporary injunction, and allowing the motion of Ar-Tik Systems, Incorporated, counter-defendant, to strike said motion of counter-plaintiff for temporary injunction.

The counterclaim here involved was filed by leave of court on May 8, 1956. The pleadings involved on this appeal are the verified complaint of plaintiff; the motion for temporary injunction by plaintiff; the answer of defendant Lark Sales Company to the complaint; the answer of defendant Lark Sales Company to the motion for temporary injunction; and the verified counterclaim of Lark Sales Company filed on said 8th day of May, 1956; motion filed May 15, 1956 of Lark Sales Company for the issuance of a temporary injunction based on said counterclaim, supported by the affidavits of Henry N. Pieper, Secretary of Lark Sales Company, and the unverified motion of Ar-Tik Systems, Incorporated, to strike the motion of Lark Sales Company for a temporary injunction under the counterclaim.

The theory of Lark Sales Company, the defendant-appellant on this appeal, is that the counterclaim, motion for a temporary injunction under same, and supporting affidavits, stated an equitable case for the granting of a temporary injunction, and that the specific grounds set out in the motion of Ar-Tik Systems, Incorporated, to strike Lark Sales Company's motion for temporary injunction are not sufficient in law to constitute a defense to said motion so as to warrant its dismissal.

Plaintiff-appellee deems it material to this court's determination of the propriety of the trial court's ac-

tion that consideration also be given to the other pleadings which the record shows were disposed of at the same time by the trial court being:

1. Motion of Lark Sales Company for modification of order granting temporary injunction, No. I;

2. Motion of Lark Sales Company for modification of order granting temporary injunction, No. II;

3. Motion of Lark Sales Company for modification of order granting temporary injunction, No. III; and,

4. Motion of Ar-Tik Systems, Incorporated for modification of order granting temporary injunction; all of said motions being filed June 29, 1956.

Plaintiff-appellee's theory of the case is that since the trial court had already entered one order in the cause with respect to injunction relief, which order had been entered after full hearings, the court did not err in requiring that all minutes relative to injunction relief be contained in one order, and that orderly procedure required a modification and conditioning of the present order rather than by the issuance of successive orders separately enjoining the various parties; that by accepting the court's suggestion in that regard by making three motions for modification to obtain the precise relief prayed for in the motion for temporary injunction (the motion for modification being considered in case No. 10,988), defendant-appellant has in effect waived any defect in the court's allowance of the motion to strike the motion for temporary injunction.

No. 10,988 is an interlocutory appeal from an order of the circuit court entered June 29, 1956, allowing the motion of the plaintiff for modification of the temporary injunction order granted April 9, 1956, and overruling the three motions of defendant Lark Sales Company, for modification of the temporary injunction order.

309

The only pleadings involved on this appeal are the three separate motions of defendant, Lark Sales Company for modification, and the motion of plaintiff, Ar-Tik Systems for modification.

The first motion of Lark for modification of the Order granting a temporary injunction stated substantially as follows:

"That the Order granting a temporary injunction should be modified in the following respects:

1. That the temporary injunction heretofore granted shall remain in full force and effect pending further Order of this court, but that said temporary injunction is subject to and conditioned upon the performance of the following terms by Ar-Tik:

(a) That Ar-Tik shall not collect or attempt to collect any monies from any persons for and on behalf of Lark.

(b) That Ar-Tik shall, upon receipt of any monies to which Lark is entitled, make report thereof and forward such monies to Lark not later than the 5th day of the month following the month in which they were received.

(c) That Ar-Tik shall forward to Lark on or before the 1st day of July, 1956, any and all monies which it has collected between the dates of April 9, 1956, and July 1, 1956, to which Lark is entitled.

(d) That Ar-Tik shall forward to Lark for the purpose of advertising and store services and to meet the commitments of the parties from the 4¢ per gallon received by Ar-Tik in the Western Territory the sum of 1½¢ per gallon; and from the 2¢ per gallon received by Ar-Tik for its own behalf in the Eastern Territory the sum of ¾¢ per gallon, said payments to be made not later than the 5th day of the month following the month in which said sums were collected.

310

(e) That Ar-Tik is not to commit any acts which modify or alter the contracts for commitments of Lark with third parties.

2. That Lark, upon receipt of any monies to which Ar-Tik is entitled, shall make report thereof and forward such monies to Ar-Tik not later than the 5th day of the month following the month in which they were received, after the deduction for advertising and store services on the basis of $1\frac{1}{2}$¢ per gallon from the 4¢ received in the Western Territory and after the deduction of $\frac{3}{4}$¢ per gallon from the 2¢ received in the Eastern Territory.

3. That Lark shall forward to Ar-Tik on or before the 1st day of July, 1956, any and all monies which it has received between the dates of April 9, 1956, and July 1, 1956, to which Ar-Tik is entitled after the deductions according to paragraph 2 of this Order."

The second motion of Lark for modification of Order granting the temporary injunction stated substantially as follows:

"That the Order granting a temporary injunction should be modified in the following respects:

That the injunction Order of April 9, 1956, is subject to and conditioned upon the performance of the following terms by Ar-Tik:

(a) That Ar-Tik shall not collect any monies from any persons for and on behalf of Lark.

(b) That Ar-Tik shall not use, withdraw or otherwise dispose of any funds which Ar-Tik has now which belong to Lark."

The third motion of Lark for modification of Order granting the temporary injunction stated substantially as follows:

"That the Order granting temporary injunction should be modified as follows:

That the injunction Order of April 9, 1956, entered

311

against Lark Sales Company is subject to and conditioned upon the performance of the following terms by Ar-Tik:

(a) That Ar-Tik shall not collect any monies from any persons for and on behalf of Lark, other than the 4¢ in the Western Territory and the 2¢ in the Eastern Territory.

(b) That Ar-Tik shall not use, withdraw or otherwise dispose of any funds which Ar-Tik has now which belong to Lark."

The motion of Ar-Tik for modification of Order granting the temporary injunction moves the court to modify the temporary injunction Order entered on its motion on April 9, 1956. This motion recites that inasmuch as defendants have moved the court that the Order granting the temporary injunction should be modified and have presented to the court three motions for modification setting forth the manner in which the Order should be modified, and inasmuch as Ar-Tik feels that none of the proposed Orders contained in such motions of defendants are proper, and inasmuch as the court has indicated that it will entertain a motion for modification of said injunction, Ar-Tik moves the court to modify the injunction by entering an Order in the terms hereinafter set out, the material portions of which are as follows:

1. That the injunction restraining defendant, Lark and L. S. Murchie from "collecting any monies from any persons for and on behalf of the plaintiff, Ar-Tik," is modified to permit Lark to collect any monies which may be owing by the various franchise holders under what is known as the "Lark Sales Territory Agreement" entered into between Lark Sales Company and certain State and District operators.

2. As to other royalty payments of 4¢ which may be due from the various State and District operators which have not, up until April 9, 1956, entered into the

312

Lark Sales Territory Agreement, Ar-Tik shall be permitted to collect the entire 4¢ royalty payments.

3. That any payments made by State or District operators under paragraph 1 or 2 above shall constitute a discharge of their liability insofar as such payments do discharge it, with respect to both Ar-Tik and Lark.

4. That Lark shall forward to Ar-Tik on or before the 10th day of July, 1956, any and all monies which it has collected between April 9, 1956, and June 30, 1956, to which Ar-Tik is entitled, after deduction of the authorized commitments for advertising and store services.

That the aforesaid injunction as modified shall remain in full force and effect until further Order of this court, but that the said temporary injunction is subject to and conditioned upon the following terms as shall apply to Ar-Tik:

1. That Ar-Tik shall, upon receipt of any monies to which Lark is entitled, make report thereon and remit the same to Lark not later than the 5th day of the month following the month in which they were collected.

2. That Lark shall, upon receipt of any monies to which Ar-Tik is entitled, make report thereof and remit the same to Ar-Tik not later than the 5th day of the month following the month in which they were collected, after deduction of commitments for advertising and store services, provided, however, that Lark shall furnish Ar-Tik with a list showing the exact commitments.

3. That Ar-Tik shall forward to Lark for the purpose of advertising and store services from the amounts collected in its own behalf such amounts per gallon as have been previously committed, by the 5th day of the month following the month of collection, provided, however, that Lark shall provide Ar-Tik with a list showing the exact commitments made.

313

4. That Ar-Tik shall forward to Lark on or before the 10th day of July, 1956, any and all monies which it has collected between April 9, 1956, and June 30, 1956, to which Lark is entitled, after deduction of the authorized commitments of the parties for advertising and store services already paid out by Ar-Tik, and Ar-Tik shall furnish Lark with a list showing payments of such commitments and to whom made.

The theory of appellant Lark Sales Company on this appeal is that the order modifying the temporary injunction does not maintain the status quo; that it violates the terms of the contract, and grants to Ar-Tik, not only all the major relief obtainable on final decree but also grants more relief than could be obtained upon final decree under the contract; that there was no evidence before the court upon the granting of the modification, so that the granting of the modification in the terms of the modification was improper; and that at least one of the three motions of defendant Lark Sales Company for modification was the only manner in which to clarify the original temporary injunction and maintain any possible status quo.

Plaintiff-appellee's theory of the case is that the trial court found a workable solution to the various contentions of the parties, that his action did not in effect disturb the status quo; that, in fact, the court's order closely approximates the order sought by defendant; and that the trial court in working out this solution was entirely within the limits of his discretion and acted in the tradition of a court of equity.

The contract out of which this dispute arises is as follows:

"This agreement entered into this 31st day of December, 1954, by and between Lark Sales Company, an Illinois corporation, hereinafter referred to as Lark; Ar-Tik Systems, Incorporated, an Indiana corporation, hereinafter referred to as Ar-Tik; H. A. McCullough

314

and H. F. McCullough, co-partners doing business as McCulloughs' Dairy Queen, hereinafter referred to as McCullough; McCulloughs' Dairy Queen, Inc., an Illinois corporation, witnesseth:

Whereas, Harry M. Oltz developed, used and obtained Patent No. 2080971 upon a mechanical device for the manufacture of a frozen dessert, and thereafter, on July 31, 1939, entered into an agreement with McCullough (hereinafter referred to as the Western Agreement), a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "A"; and

Whereas, on June 11, 1940, Harry M. Oltz assigned, transferred and set over to Ar-Tik the aforesaid patent, together with all his rights under the Western Agreement; and

Whereas, the Western Agreement was thereafter supplemented by an agreement between Ar-Tik and McCullough dated September 7, 1946, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "B"; and

Whereas, on September 7, 1946, Ar-Tik and McCullough entered into an agreement (hereinafter referred to as the Eastern Agreement), a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "C"; and

Whereas, by agreement between Ar-Tik and McCullough dated September 17, 1947, in the nature of a license, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "D", Ar-Tik became the sole owner of the right to use the said patented mechanical device and the trade name "Dairy Queen" in the States of North Carolina, South Carolina, Georgia, Florida, Alabama and Mississippi, together with the right to receive and collect all of the royalty for its sole account and without division there-

315 °

of with McCullough under the terms of the Eastern Agreement; and

Whereas, the Eastern Agreement was further supplemented by agreement between Ar-Tik and McCullough dated February 20, 1953, a true and correct copy of which is hereto attached, made a part hereof and marked Exhibit "E"; and

Whereas, from time to time certain interests in the said agreement hereinbefore mentioned have been held by Dairy Queen; and

Whereas, it was the intent of all of the parties to said agreements that McCullough would institute and develop a business for the sale of a frozen dessert through the use and sale or license of the said patented mechanical device and that in the institution and development of such business a trade mark and trade name would be used and published; and

Whereas, McCullough, and subsequently Dairy Queen, in compliance with the agreements and the intent thereof, did institute and develop a business which comprises the selling of a frozen dessert product in various forms under the trade name or trade mark "Dairy Queen" from retail outlets bearing the trade name or trade mark "Dairy Queen", and also by advertising, and otherwise established the trade name or trade mark "Dairy Queen" throughout the United States, and used the trade name or trade mark on mechanical devices manufactured under the aforesaid patent in the preparation and dispensing of products known as "Dairy Queen"; and

Whereas, McCullough and/or Dairy Queen have obtained registrations of the trade mark or trade name "Dairy Queen" in all States of the United States except California and Wisconsin; and

Whereas, it was the further intent of the aforesaid Eastern and Western Agreements, as amended, that the trade name or trade mark and the patented mechan-

316

ical equipment would be used together in the same business to the end that Ar-Tik would at all times receive a royalty or license fee for the use thereof in the Western Territory of 4¢ per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade mark or trade name "Dairy Queen", and a royalty or license fee for the use thereof in the Eastern Territory of 2¢ per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade mark or trade name "Dairy Queen", but with the distinct understanding, in so far as the Western Agreement is concerned, that McCullough would pay said royalty or license fee on all of said mechanical equipment owned or operated by him, and that the said royalty or license fee would be paid over to Ar-Tik as funds therefor were received by McCullough for the account of Ar-Tik from the operators (hereinafter referred to as licensees) of said mechanical equipment and/or the said trade mark or trade name, which were not owned or operated by McCullough or Dairy Queen; and

Whereas, under the Eastern Agreement Ar-Tik collected and received from licensees a royalty of 4¢ per gallon on each gallon of mix processed through said patented mechanical device or sold under the trade name "Dairy Queen", of which one-half was remitted to McCullough pursuant to the terms of the Eastern Agreement, as supplemented, until December 31, 1954; and

Whereas, by agreement dated March 20, 1954, McCullough and Dairy Queen assigned and transferred to Lark all their interests under the Western Agreement, except certain territory payments specifically set forth in Exhibit "C" attached to said agreement, a true and correct copy of which assignment agreement is attached hereto, made a part hereof and marked Exhibit "F"; and

317

Whereas, by assignments dated April 2, 1954, McCullough and Dairy Queen assigned and transferred to Lark interests under the Eastern Agreement, a true and correct copy of which assignments is attached hereto, made a part hereof and marked Exhibit "G-1"; and,

Whereas, by assignment dated December 31, 1954, Ar-Tik assigned and transferred to Lark the right to collect in its behalf, a true and correct copy of which assignment is attached hereto, made a part hereof and marked Exhibit "G-2"; and

Whereas, McCulloughs' Dairy Queen, Inc., an Illinois corporation, has been formed as a permanent organization to hold title to the trade mark and trade name "Dairy Queen", and McCullough, Dairy Queen and Ar-Tik have assigned and transferred to the said corporation all of their right, title and interest in and to the said trade mark and trade name, and by Territory Agreement dated April 2, 1954, McCulloughs' Dairy Queen, Inc., an Illinois corporation, granted to Lark the exclusive right to use, license and to permit others to use, sub-license and sub-contract the trade mark or trade name "Dairy Queen" throughout the continental United States, subject to prior rights, a true and correct copy of which Territory Agreement is hereto attached, made a part hereof and marked Exhibit "H"; and

Whereas, Lark is willing to collect and receive all sums of money which may become due and payable to Ar-Tik, for the purpose of remitting the same to Ar-Tik and for the purpose of carrying out all of the provisions of this Agreement; and

Whereas, pursuant to the terms of the aforementioned agreements, Lark has entered into certain revised territory agreements as provided under the terms of the Territory Agreement (Exhibit "H" hereto attached), and has made provision for the continuation without any interruption of all agreements relating to

318

the said patented mechanical device and the trade name and trade mark "Dairy Queen", and it is the intent of all parties to this agreement that Lark shall be the instrumentality for the further development of the interests of the respective parties, to the end that the said parties may cooperate together for their mutual benefit, that said development shall continue through one instrumentality, to more clearly and completely construe and define the undertakings of each of the aforementioned agreements, and to effect the intent of this agreement; Now, therefore,

In consideration of the mutual covenants and agreements herein contained and the sum of One Dollar ($1.00) in hand paid each to the other, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties hereby promise and agree as follows:

1. Ar-Tik consents to, approves and accepts the transfer, sale, assignment and delivery to Lark of all rights of McCullough and Dairy Queen in and to the said agreements made by and between Harry M. Oltz and H. A. McCullough under date of July 31, 1939, as supplemented by agreement dated September 7, 1946, between Ar-Tik and McCullough (except certain cash payments as shown by Schedule "C" of Exhibit "F" due to others), and agreement between Ar-Tik and McCullough dated September 7, 1946, as supplemented by agreement dated February 20, 1953, between Ar-Tik and McCullough, and the agreement dated September 17, 1947, by and between Ar-Tik and McCullough relative to the operation of the business in six southeastern States in the United States, and said Ar-Tik does further acknowledge that Dairy Queen and McCullough have fully performed each and every of said agreements in this paragraph described to the date of this agreement, and does further release and

319

discharge McCullough and Dairy Queen of and from all past and future liability in connection with or arising under said agreements. No assignment of this agreement shall be made by Lark without the written consent of Ar-Tik.

2. Lark shall endeavor to re-negotiate Territory Agreements to the end that the standards of operation of said Dairy Queen business shall be uniform and in accordance with the rules, standards and regulations required by McCulloughs' Dairy Queen, Inc. in connection with the operation under and use of said trade mark and trade name, as set forth in the Territory Agreement Exhibit "H" attached hereto. Each and every such contract negotiated by it shall contain a provision requiring that the licensee shall pay a royalty or license fee of not less than 4¢ per gallon of liquid mix used in the preparation of the frozen dairy product sold under the trade mark or trade name "Dairy Queen" within such territory for the period of time that such rights shall be granted, which Lark shall collect and remit as set forth in Paragraph 5 of this agreement. Such Territory Agreements shall further provide that such payments shall be made regardless of the existence or non-existence of patents or after the expiration thereof or otherwise, and where either powdered or concentrated mixes are used, the payment shall be based on the equivalent in liquid mix and shall further require that such amount as shall be due and owing shall be computed at the end of each month's operation, and remittance of the same shall be forwarded, together with proper reports, within such time as Lark shall require. Dairy Queen and Ar-Tik agree to assist Lark in negotiating such new Territory Agreements. No change shall be made in the Territory Agreements which shall diminish the rights of Ar-Tik hereunder except upon written approval of Ar-Tik.

3. Lark shall hold all reports as required under said Territory Agreements and make available to Ar-Tik all information contained therein in such manner and form as may be determined by the parties from time to time. Lark further agrees to give notice to Ar-Tik of any default of licensees in payments or failure to report, not later than 30 days after such default or failure to report.

4. Lark shall further, in cooperation with Ar-Tik, take such measures to cure and eliminate any such defaults and failures to report, provided, however, Lark shall not be required to expend funds in excess of such as may be provided by Ar-Tik or Lark for such purposes.

5. Lark hereby undertakes the continued performance of said agreements described in Paragraph 1 hereof pursuant to the terms of this agreement and the terms of all sub-contracts, licenses or franchise agreements assigned to Lark and others, and shall collect all monies due Ar-Tik as hereinafter set forth. Lark shall use its best efforts to collect and receive for the account of Ar-Tik and Lark and others respectively, from the licensees (whether under licenses presently in existence or under re-negotiated Territory Agreements), on all mix used in the frozen dairy product sold under the trade mark or trade name "Dairy Queen" or processed through said freezers as shown in Exhibit "I" attached.

To enable Lark to collect from Licensees under the Eastern Agreement, Ar-Tik shall notify each of said licensees to make payment to Lark of all sums due Ar-Tik under their respective territory agreements "until further notice", and Ar-Tik will not countermand such notice so long as Lark is not in default under this agreement.

Upon receipt of said monies, Lark shall pay over to Ar-Tik, or its assigns, only the amounts received for

the account of Ar-Tik, as hereinabove set forth, on or before the 10th day of the month following actual receipt of such monies by Lark.

Notwithstanding the foregoing, from such amounts per gallon so received by Lark, Lark shall retain such sum computed at such rates per gallon as shall be agreed upon from time to time by Lark and Ar-Tik and said sum shall be expended for the purpose of developing the Dairy Queen business as Lark and Ar-Tik may from time to time determine.

6. Lark shall render to Ar-Tik a report of its costs of operations from time to time, which report shall show the areas occasioning such expenses and the amounts thereof, and Ar-Tik, within ten (10) days of receipt of such report, shall make payment to Lark of Ar-Tik's share of such expenses in the proportions to which Ar-Tik and Lark are sharing revenue from such area as set forth in Paragraph 5 above.

7. Dairy Queen, Ar-Tik and Lark agree that should any one of them receive or have received any funds to which any one of the others is entitled, they will pay any and all such funds to Lark for distribution in accordance with the terms of this agreement.

8. Lark agrees to furnish to Ar-Tik such copies and information as Ar-Tik may request concerning all Territory Agreements hereafter granting rights to the use of the trade mark and trade name "Dairy Queen", and will make available to Ar-Tik such copies and information concerning present Territory Agreements as it now has in its possession.

9. Lark agrees to make available to Ar-Tik at all reasonable times such records, contracts, reports for the determination and verification of any and all payments due to Ar-Tik.

10. Lark and Ar-Tik shall jointly undertake to improve and further the Dairy Queen business, including the development of new products, the improvement and

322

invention of equipment for use in processing and selling Dairy Queen products, the obtaining of patent protection for said new products and equipment, the possible selection of secondary trade marks and the registration thereof, the originating of advertising matter and the like which may be copyrightable and the obtaining of copyright registrations therefor; and all property rights developed hereunder shall be for the use and benefit of Lark and Ar-Tik and the Dairy Queen business. It is understood and agreed that the ownership of all trade mark registrations, copyright registrations, and the like shall be vested in Mc-Culloughs' Dairy Queen, Inc. which shall license the use of the same through Lark to the owners and operators of Dairy Queen business, and the ownership of all patent rights shall be vested in Ar-Tik, and Lark shall have the sole and exclusive right to make, use, and sell, and to license others to make, use, and sell said products and equipment in the Dairy Queen business. None of the parties hereto shall be obligated to defend any of said patents and all offensive litigation relating to said patents shall be controlled by the owner thereof who shall pay all expenses and retain all income resulting therefrom.

11. That all freezers used in the processing of the frozen dairy product sold under the trade mark or trade name "Dairy Queen" shall be manufactured and/or sold under the supervision and control of Lark.

12. Contemporaneously with the execution of this agreement and for the purpose of providing a permanent organization to control and make uniform the operations under, the quality of products and the use and protection of the trade mark and trade name "Dairy Queen", Ar-Tik has sold, assigned, transferred and set over to McCulloughs' Dairy Queen, Inc., an Illinois corporation, all its right, title, interest in and to the trade mark and trade name "Dairy Queen"

323

as used on and in association with the sale of the frozen dairy product, together with the good will of the business in connection with which said trade mark and trade name is used, in exchange for and upon Lark executing the Territory Agreement with Ar-Tik for the territory comprising the States of Alabama, Georgia, Florida, Mississippi, North Carolina and South Carolina, (Exhibit "H" attached hereto).

Nothing herein contained or to be contained in the Territory Agreement with Lark, as hereinabove provided, shall be construed to require the payment of any sum of money to Lark for its own account on mix sold in the States of North Carolina, South Carolina, Georgia, Florida, Alabama and Mississippi.

13. Ar-Tik appoints Lark its attorney in fact with full power and authority in its or their joint names to sue for and collect all monies due from licensees under said Western Agreement and said Eastern Agreement, and upon receipt of such funds, to account for and pay over the same in accordance with the terms of this agreement.

14. In the event Lark shall have failed to take action to enforce the liability of licensees under said Western Agreement or said Eastern Agreement or this Agreement, and Ar-Tik shall notify Lark in writing setting forth the nature of such claimed failure to act, and in the event Lark shall fail to diligently take steps to correct such condition within sixty (60) days thereafter, then Ar-Tik shall thereupon have a right in its own name or in the name of Lark and/or McCulloughs' Dairy Queen, Inc. but at its sole cost and expense, to take such action as it may deem necessary or proper in the premises, and in the event recovery is made in any such action Ar-Tik shall account for any proceeds collected in accordance with the terms of this Agreement.

324

15. The provisions of this agreement relating to the collection and receipt of monies by Lark for the account of Ar-Tik shall continue for a period of five (5) years commencing January 1, 1955, and ending on December 31, 1959, and shall continue thereafter for successive five (5) year periods unless sixty (60) days prior to the end of any such period either Lark or Ar-Tik shall notify the other of the termination of such agreement in so far as Lark is acting for Ar-Tik in the collection and receipt of monies due Ar-Tik under the terms of this agreement. Lark does by these presents irrevocably name Ar-Tik as its nominee to receive payment of the said sums due Ar-Tik as set forth in Paragraph 5 hereof from all licensees under the Territorial Agreements effective upon termination hereof as provided herein.

16. Nothing contained in this agreement shall be construed as an assignment by Ar-Tik of any right, title or interest which it holds under the terms and provisions of the Eastern Agreement and the Western Agreement, as such Agreements are respectively supplemented, except to the extent hereinabove set forth.

17. If any one or more of the following events (hereinafter sometimes called "Events of default") shall occur:

(a) If Lark shall at any time fail or refuse to pay over to Ar-Tik any sum of money received by Lark for the account of Ar-Tik under the terms and provisions hereof; or

(b) If Lark shall not continue to be qualified at all times as a corporation duly organized and existing under the laws of the State of Illinois, or shall make any assignment of any right under the Eastern Agreement and Western Agreement or Territory Agreement Exhibit "H" attached hereto except as herein provided; or

325

(c) If Lark shall otherwise fail or refuse to keep and perform any of the terms, covenants and agreements herein contained on its part to be kept and performed; provided, however, action by Ar-Tik under Paragraph 14 shall not be a default hereunder, unless Lark shall habitually or completely fail to endeavor to enforce the liability of Licensees under said Western, Eastern and this Agreement; and

(d) If Lark shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute of law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Lark or of all or any substantial part of its properties or assets; or shall suffer a judgment or other lien upon any of its property or assets to remain unsatisfied; provided that at all times Lark shall not be in default in this respect if it is in the process of litigation in the matters mentioned in this Paragraph 17;

and such event of default shall continue for a period of fifteen (15) days after notice in writing by Ar-Tik to Lark, then and in either of such events of default, Ar-Tik may, at its option, terminate all rights of Lark to receive and collect any sum of money which may be due or become due to Ar-Tik.

18. If any portion of this agreement shall be held invalid, such portion shall be inoperative, but the remainder shall continue in full force and effect.

19. Any notice or notices which may be required to be given by the terms of this agreement shall be in writing and shall be considered to have been prop-

326

erly given if sent by United States mail, postage prepaid.

(a) If to Lark, addressed to Lark at P. O. Box 335 Moline, Illinois, or at such other address as Lark from time to time may have designated by written notice;

(b) If to Ar-Tik, addressed to Ar-Tik at 3280 SW 22nd Street, Miami, Florida, or at such other address as Ar-Tik from time to time may have designated by written notice;

(c) If to Dairy Queen, addressed to Dairy Queen at P. O. Box 335, Moline, Illinois or at such other address as Dairy Queen from time to time may have designated by written notice;

(d) If to McCullough, addressed to McCullough at P. O. Box 335, Moline, Illinois or at such other address as McCullough from time to time may have designated by written notice;

(e) If to McCulloughs' Dairy Queen, Inc., addressed to McCulloughs' Dairy Queen, Inc., at P. O. Box 335 Moline, Illinois, or at such other address as McCulloughs' Dairy Queen, Inc. from time to time may have designated by written notice.

20. This agreement shall be binding upon and inure to the benefit of the respective parties, their respective heirs, executors, administrators, successors and assigns.

In witness whereof, Lark, Ar-Tik and McCulloughs' Dairy Queen, Inc. have caused these presents to be signed in their respective corporate names and their respective corporate seals to be affixed, by their thereunto duly authorized officers, and H. A. McCullough and H. F. McCullough, co-partners doing business as McCulloughs' Dairy Queen, and H. A. McCullough individually, have hereunto set their hands and affixed their seals as of December 31, 1954, on this the 25th day of February, 1955.

Lark Sales Company

By G. E. Stange
$\overline{\hspace{1cm}\text{President}\hspace{1cm}}$

Attest: H. N. Pieper
$\overline{\hspace{1cm}\text{Secretary}\hspace{1cm}}$

Ar-Tik Systems, Incorporated

By Harry M. Oltz
$\overline{\hspace{1cm}\text{President}\hspace{1cm}}$

Attest: Roger D. Oltz
$\overline{\hspace{1cm}\text{Secretary}\hspace{1cm}}$

Signed, Sealed and Delivered in the presence of:

Leonard D. Hunt
_____

Gladys C. Noah
_____
As to H. A. McCullough and H. F. McCullough, co-partners doing business as McCulloughs' Dairy Queen

Leonard D. Hunt
_____

Gladys C. Noah
_____
As to H. A. McCullough individually

H. A. McCullough

By L. S. Murchie
$\overline{\text{Atty in Fact} \hspace{1cm} \text{(Seal)}}$
H. A. McCullough

H. F. McCullough (Seal)
$\overline{\text{H. F. McCullough}}$
Co-partners doing business as McCulloughs' Dairy Queen

H. A. McCullough

By L. S. Murchie
$\overline{\text{Atty in Fact} \hspace{1cm} \text{(Seal)}}$
H. A. McCullough

McCulloughs' Dairy Queen, Inc.

By Charles J. Hart
$\overline{\hspace{1cm}\text{President}\hspace{1cm}}$

Attest: P. D. Robinson, Jr.
$\overline{\hspace{1cm}\text{Secretary}\hspace{1cm}}$"

The case involves a dispute between the so-called royalty interests of the entire Dairy Queen Industry in the United States. The contract which is the subject

328

of this dispute is not an ordinary one, and some knowledge of its background is necessary to an understanding of the case. Harry M. Oltz, the predecessor in interest of plaintiff, Ar-Tik Systems, Incorporated, patented a freezer in 1937. Thereafter he entered into various agreements with H. A. McCullough, the first being in 1939, by which McCullough and his successors in interest developed a business of selling a frozen ice cream product known as "Dairy Queen" throughout the United States, by virtue of which Oltz received certain payments per gallon of mix sold, as did McCullough. Prior to December 31, 1954, McCullough and his successors in interest transferred all of their rights to defendant, Lark Sales Company. On December 31, 1954, the subject contract was entered into.

For a number of years prior to December 31, 1954, the plaintiff Ar-Tik Systems, Incorporated, had been collecting the 4¢ royalty payments throughout the entire United States. In the Western Area it was entitled to keep all collections. In the Eastern Area Ar-Tik was entitled to keep 2¢, the other 2¢ belonging to McCullough. Ar-Tik geared its operations to the steady influx of royalties, which were necessary for its continued orderly operation.

When the patent expired, difficulties in collection of royalties arose and these difficulties, the practical necessity of consolidating the various royalty interests in a single entity for the purpose of national dealings and other considerations, led to the execution, on December 31, 1954, of the subject contract. By this contract, Ar-Tik surrendered its claims against H. A. McCullough personally, and also surrendered to Lark its vital and valuable right of direct collection of royalties, but in return therefor, exacted the clear and specific provision in paragraph 5 of the contract that upon collection of Ar-Tik's monies by Lark, "Lark shall

pay over to Ar-Tik the amounts received for the account of Ar-Tik on or before the 10th day of the month following actual receipt of such monies by Lark."

The failure of Lark to pay over any part of the more than $62,000 collected by it on behalf of Ar-Tik, thus depriving Ar-Tik of the continuous flow of funds contemplated in the contract, is, in brief, the compelling reason for the institution of this suit by Ar-Tik.

The preamble to the contract contains the following language:

"Whereas, by assignment dated December 31, 1954, Ar-Tik assigned and transferred to Lark the right to collect in its behalf, a true and correct copy of which assignment is attached hereto, made a part hereof and marked exhibit G–2; and, . . .

"Whereas, Lark is willing to collect and receive all sums of money which may become due and payable to Ar-Tik, for the purpose of remitting the same to Ar-Tik and for the purpose of carrying out all of the provisions of this Agreement; . . .

Paragraph 2 of the contract provides that

"Each and every such contract negotiated by it (Lark) shall contain a provision requiring that the licensee shall pay a royalty or license fee of not less than 4¢ per gallon . . ., which Lark shall collect and remit as set forth in Paragraph 5 of this agreement. . . .

"Dairy Queen and Ar-Tik agree to assist Lark in negotiating such new Territory Agreements. No change shall be made in the Territory Agreements which shall diminish the rights of Ar-Tik hereunder except upon written approval of Ar-Tik."

Paragraph 3 of the contract provides:

"Lark further agrees to give notice to Ar-Tik of any default of Licensees in payments or failure to report,

not later than 30 days after such default or failure to report."

Paragraph 5 of the contract provides that Lark is to collect for Ar-Tik, but that upon receipt of said monies, Lark shall pay over to Ar-Tik the amounts received on or before the 10th day of the month following actual receipt of such monies by Lark.

Paragraph 6 provides that Lark shall render to Ar-Tik a report of its costs of operations from time to time, which report shall show the areas occasioning such expenses and the amounts thereof.

Paragraph 10 provides: "Lark and Ar-Tik shall jointly undertake to improve and further the Dairy Queen business, . . ."

Exhibit G–2 to the contract dated December 31, 1954, which was a contract between Lark and Ar-Tik executed contemporaneously with the main contract provides:

"Lark hereby undertakes to collect for Ar-Tik the sums due or to become due to Ar-Tik under the terms of the aforesaid Western and Eastern Agreements and Supplements, all in accordance with the main agreement of even date, to which this agreement is to be attached, and promises and agrees to pay to Ar-Tik or its assigns all cash considerations received arising from receivables by Ar-Tik under contracts executed by H. A. McCullough, McCulloughs' Dairy Queen and/or Lark to others in the nature of sub-contracts, franchises or licenses granted pursuant to said Western Agreement and Supplement (4¢ per gallon) and Eastern Agreement and Supplement (2¢ per gallon), except such portion thereof as Ar-Tik may, in writing, direct Lark to retain as its property."

The preliminary hearing before the court developed the following facts: That Lark entered upon its duties as agent and attorney for Ar-Tik on or about the 23rd

331

day of February, 1955. At that time Ar-Tik had in its possession about $62,000 which admittedly belonged to Lark (or the McCulloughs). Lark was also holding funds belonging to Ar-Tik, the exact amount of which was not shown. These funds, in the main had been accumulated during the Peoria litigation between the parties. Some time in a June conference between the parties, it was agreed that Ar-Tik was to hold the funds it had until such time as Lark's collections in its behalf should reach the $62,000 figure, at which time the parties were to strike a balance. This balance was in fact struck on September 10, 1955, just two days after the Peoria litigation was concluded. The defendant Murchie of Lark contended throughout the hearing that their agreement for an offset on the $62,000 figure was to be a permanent thing, but he admitted receiving the document described in the next paragraph.

On June 21, 1955 after a conference between Murchie, Mr. Pieper and Harold Oltz in Moline, Mr. Oltz of Ar-Tik sent Mr. Murchie of Lark a letter enclosing a memorandum of their June conference. This memorandum of their conference showed that Lark should retain collections until Ar-Tik's balance was reached and that after the settlement of this account, Lark would send the Ar-Tik collections and that "These would be the net amounts due Ar-Tik after deducting the dues and whatever deductions are later agreed upon and authorized to be made." By the enclosing letter Murchie was requested to "make any changes or alterations of the memorandum of that conference if it does not meet with your approval." Murchie did not reply to this letter.

From September 1, 1955 to December 31, 1955 Lark collected monies belonging to Ar-Tik in the amount of $77,644.97 and it had deducted therefrom the gallonage deductions authorized by paragraph 5 of the contract in the amount of $15,558.43, but it had not remitted to Ar-Tik any of the balance of $62,086.54.

A further breach of the contract is shown by the evidence in that at no time since it assumed its duties did Lark make a report of the delinquencies of the store operators. Further, the contract specified precisely how Lark was to receive its funds from Ar-Tik for costs of operation which were properly attributable to Ar-Tik. Paragraph 6 required that a statement should be rendered showing the areas where the expenses were occasioned and Ar-Tik was to remit its share in accordance with a schedule attached to the contract within ten days after receipt. Lark did not comply with this specified procedure. On the eve of the hearing, defendants made their breakdown, but it had never been presented to plaintiff.

Defendants contend that Murchie was not a proper party to these proceedings, for the reason that he testified he was not a stockholder, director, officer or employee or managing agent of Lark. The record, however, shows that Murchie owned all the stock of McCulloughs' Dairy Queen, Inc., which in turn owned all the stock in Lark; that Murchie was the person dealt with by anyone dealing with Lark; that Murchie was the only person who was thoroughly familiar with Lark's affairs, and that his duties for Lark encompassed everything that any managing agent would perform. His name appeared on the contract of December 31, 1954 as attorney in fact for H. A. McCullough.

Without detailing the voluminous evidence in this case, it is apparent from an examination of the record that the trial court had before it a complicated and seriously disputed set of facts. The lower court acted after due notice had been given and a full hearing had in the matter, and after requiring plaintiff to furnish a substantial bond. In Forster v. Fruin & Walker Co., 170 Ill. App. 89, 91 the court states:

" 'The court having jurisdiction in equity, as we think, to hear and determine the case presented by the

bill, the next question is, did the court improperly exercise its discretionary power in granting the temporary orders appealed from.

" 'The rule governing us on this question is that unless it clearly appears that the court below improperly exercised its discretionary powers in issuing the injunction pendente lite the order should be affirmed.' "

In McDougall Co. v. Woods, 247 Ill. App. 170, the trial court issued an interlocutory order enjoining defendant from collecting any monies which belonged to the plaintiff and from using any of said funds for his own use. The court said at page 172:

"The contract, in terms, made defendant the agent of complainant with reference to collections, and the bill alleges that defendant has a considerable sum of money in his hands belonging to complainant, for which defendant refuses to account. The bill prayed for an accounting and an injunction and the appointment of a receiver . . . .

"In appeals from interlocutory orders it is not our province to determine the rights of the parties in the subject matter of the litigation, but simply to determine from the averments of the bill whether the party probably is entitled to the relief sought. Where such an order is improvidently granted without notice, in a case where notice should have been given, or where the statute requires a bond as a condition precedent and none has been given, the interlocutory orders so improvidently granted will be reversed without reference to the merits of the cause. . . .

p. 174:

"The essence of the bill is the averment of a fiduciary relationship between the parties, in which defendant in the matter of collections made by him was the agent of complainant, having under his control the

only books showing such collections and the accounts. There was no impropriety in temporarily enjoining the defendant from collecting or receiving any monies which equitably belonged to the complainant and from using any of said funds for his own use."

In the case of Lee v. Hansberry, 291 Ill. App. 517, p. 522 the rule relative to a court of equity's power in these cases has been stated as follows:

"A further point is made that the order is wrong and should be reversed because it disturbs 'the status quo' of the parties, in that Hansberry and his wife are ordered to vacate and give up possession of the premises at 6140 Rhodes Avenue within 90 days, and it is said that a preliminary mandatory injunction 'cannot be entered except under rare circumstances,' where the case has not been heard on its merits. . . .

" 'There is no magic in the phrase "Maintaining the status quo" which transforms an injunction essentially prohibitive into an injunction essentially mandatory.' . . . There are cases in which the status quo ought not to be maintained."

In Friedman v. Peckler, 255 Ill. App. 199, it was held that on appeal from an interlocutory decree for a temporary injunction the court would not interfere with the discretion of the trial court in granting the decree where the requirements of the statute on the granting of such interlocutory orders had been complied with by the giving of notice and bond by the complainant.

In its appeal in case No. 10,987 from the order denying defendant's motion on its counterclaim for a temporary injunction, defendant contends that a preliminary injunction may be granted by the court without expressing, or without having the means of forming, a final opinion as to the rights of the parties; that until a final judgment is reached there can be no estoppel by judgment or by decree; and that orderly

procedure in a court of equity does admit of the issuance of an injunction under the counterclaim.

Without this court making an exhaustive analysis of the many cases holding that the chancellor is not bound by rigid form, but may mold his decree to fit the situation, the Circuit Court of Appeals for the Fourth Circuit, in Bowen v. Hockley, 71 F.2d 781, 786 has aptly stated:

". . . the chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief. In fact, there is no limit to the various forms and kinds of specific remedy which he may grant, adapted to novel conditions of right and obligation, which are constantly arising from the movements of society. While it must be admitted that the broad and fruitful principles of equity have been established, and cannot be changed by any judicial action, still it should never be forgotten that these principles, based as they are upon a Divine morality, possess an inherent vitality and a capacity of expansion, so as ever to meet the wants of a progressive civilization."

The lower court had the matter under consideration from the time the complaint was filed and the motion for temporary injunction was presented by plaintiff. It had other motions presented and argued. It heard a substantial amount of testimony. It did, in fact, modify the original temporary injunction which it had issued. It found that plaintiff was entitled to relief as evidenced by the issuance of the temporary injunction, and by the subsequent modification of same. We do not find fault with defendant's contentions. However,

we believe that the lower court carefully considered all phases of the controversy and felt that defendant was not entitled to a temporary injunction on the state of the record as evidenced by the pleadings, motions and evidence which had been submitted. We are not inclined to disturb his actions.

In addition to defendants' appeal from the court's order denying them a temporary injunction on their counterclaim in case No. 10,987, the court had before it, in case No. 10,988, a situation where plaintiff and defendants each were seeking to have the trial court modify the original order for temporary injunction entered on April 9, 1956. It is apparent from the terms of the order modifying the original order in the form presented by plaintiff that the chancellor was attempting to find a practical working solution to the situation created by the changed conditions brought about by the temporary injunction. In the various pleadings, hearings and orders appearing in this cause, it is further apparent that the ear of the chancellor was readily available to the respective complaints and contentions of the different parties on the different occasions these matters were presented in court. As was said in McDougall Co. v. Woods, supra, at 174: "We do not feel called upon to pass upon the demurrability of the bill or the merits of the cause." We believe that the court's decrees in issuing the temporary injunction sought by plaintiff, in denying the temporary injunction sought by defendants, and in modifying the original order granting the temporary injunction, were within the court's discretion and should be affirmed.

Decrees affirmed.

DOVE, P. J., concurs in affirming the several orders appealed from.

CROW, J., concurs.